Our next case this morning, Your Honor, is 25-1519, Gina Russo v. New Hampshire Neurospine Institute. Appellant's counsel, please. May I please the court? My name is Robert Mantel. Arguing on behalf of the appellant, Gina Russo. Kenny Berdrager is with me. If I may, could I have three minutes of rebuttal? You may. Thank you. Despite 11 years of accolades, bonuses, and positive evaluations, Gina Russo was terminated by the New Hampshire Neurospine Institute because of her gender, and her transition period and contractor position were ended due to retaliation. The Supreme Court tells us that the Institute is liable for discrimination if Russo's supervisor, in this case, Dr. Ahn, quote, performs an act motivated by unlawful animus that is intended by the supervisor to cause an adverse employment action, and if the act is proximate cause of the action. In this case, Dr. Ahn was the proximate cause for Russo's termination, and the Institute's board rubber-stamped it. The Institute fired Russo despite the fact that they never found she did anything wrong, never disciplined her, never evaluated her as inadequate. When terminating Russo- Right, that's because they had to make a business choice, and so I think you're rightly saying that Ahn, we have to figure out, you know, they just decide that, well, it's her or him, we're going to go with him because probably he's generating more revenue. So what tells us, I mean, the key is what tells us that Ahn was improperly motivated, and that's what this comes down to. We know there's ample evidence of that. Dr. Ahn's behavior was suffused with gender dynamics. His sense that Russo avoided work for him was supported by assertions that she was insufficiently warm to him and did not communicate well with him through body language and eye contact. His responses to Russo were unprofessional and over-the-top, for example, arguing that she did not help him in 2016, even though he knew that two doctors had told her to stay with a different patient. And in 2019, when he was arguing for her termination, he relied on... But it could be that she did nothing wrong in staying at Elliott, but she was rude about it. And so if she was rude about it, that would be a reason that he might be upset about it, whether she did something wrong in the sense of she should have acted, gone somewhere different. So what tells us it's gender-motivated as opposed to Dr. Ahn may have a thin skin. That's maybe not good, but it's not gender discrimination. There's two answers to that. First, his reasoning for the termination was the merits. She did not help me. So in arguing for termination, he says she did not come and help me in 2016. And two other doctors at that termination meeting have to say she did everything right. I thought it was pretty clear in the conversations with Wayne that he says she was rude to me. Sorry? When he calls Wayne to try to think it's whichever doctor it was, to check on whether she really was doing something at Elliott that was important, part of what he says is she was rude and disrespectful. That's right. And when you're in a stereotyping case, it can be that Ahn genuinely felt frustrated with Rousseau. But we have an enormous amount of data here showing that his perception of rudeness was gender-related. For example, he had many, many poor interactions with women in the workplace. He refused to speak to one physician's assistant for months. He had an extended conflict with another woman based on her failure to say hi and blocked her promotion after it was announced. He would yell at his subordinates, asking how dare they do something, and accusing them of disobeying with him. He would hang up on them. Other female colleagues reported being screamed at, belittled, in front of students, thrown out of the room, refused to work with him. Did he also refuse to work with some other male employees as well? No. The answers to interrogatories do not say that, and so there is a dispute of facts to that. The answers to interrogatories clearly say he refused to work with the only women physician assistants, but those same answers to interrogatories do not say that he refused to work with men. So that is in dispute. Now, even Talbot Kleeman, the female executive director, reported episodes of yelling and coldness between her and An. How is that disputed? I mean, An says, I refuse to work with Smith and Denzik, two males, and I want them to be terminated. How are you disputing that that is not true? Because in the answer to interrogatory 15, we ask specifically, who did you refuse to work with? And he does not include those gentlemen. And he does include Flamadon and the plaintiff, so there is a dispute of facts. Because of his own inconsistencies? Correct. Now, in fact, we have evidence that he yelled at Talbot Kleeman's sister about failing to type something correctly, and for years they could not interact. Now, compare that to how he treated men in the workplace. Same people, physicians assistants. And Tim Miller says that he saw blowups, but he never saw a blowup against another man. The data was there were men who mocked An, there were men who made mistakes, that he dealt with them respectfully, that he used these moments as teaching moments. There was a dramatic difference between how he treated men versus women. The women, we have actual examples, actual data. You know, they're saying, oh, well, he was high strung. But we do not have similar examples of that at all. The males, including Tim Miller, specify that there were no similar examples against a man. Now, we also have evidence of discrimination based on the combination of the prima facie case and pretext, and we have a lot of pretext. We have, for example, the Institute's brief says in three places, she called him lazy. She was unapologetic. Well, that conversation occurred the day after the termination. So we know that's pretext. And we have that certainty because Talbot Cleman writes a memo dated March 26th saying, on this day I had a conversation with Russo, and she said these things, lazy things. So we know that the comments they're claiming they relied on occurred after the decision to terminate. Wasn't there a testimony to the extent that kind of the straw that broke the camel's back was the rudeness at the third identified event? Again, his reasoning was based on the merits and not the rudeness. And let me explain. This is Ahn's thing, saying, when I asked Russo to do this, he said, I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through so you can do it yourself? I was taken aback because I obviously would not want her to stop her current tasks in another hospital and have her walk me through multiple computer tasks, which would have been extremely inefficient. She was framing a choice for me to make so that she could get out of doing the task. He's not talking about rudeness here. He's talking about the choice that she's giving him, which is, I'm happy to go home and do it, or I'm happy to talk you through it. Now, he's saying this choice she gave him was an effort to get out of doing the task, when she is saying, here's how I can do the task. So he is reacting. All of this is in the eye of the beholder. I mean, I take your point on men and women, and we'll have to dig into the record and figure out if he's treating people differently. But to say he's difficult, he's short-tempered, just by itself doesn't really advance the ball. You know, you say it in a way that sounds pleasant. We don't know that's how she said it. I mean, so, you know, it has to be something that ties it to gender, not just he's difficult. Well, the comparator evidence is overwhelming. For example, he refused to work with women but did not refuse to work with men. He has this statement, I couldn't look at myself in the mirror as a husband and father, and let me break that down for a minute. Husband and father has a legal and biological element. He wasn't referring to those. He was referring to the idea that as a husband and father, you get to have leadership there, and you're entitled to deference. And what he's saying is the way she treated him was inconsistent with how he expected himself to be treated as a husband and father, and in turn imposed those traditional gender roles into the work. Well, you just added the gender roles, because I could say the exact same comment if the person on the other side of that was a male. I don't see how the father and husband connect to who's doing the disrespectfulness. The husband and father are masculine roles. It's just his roles. He is a husband and father. But why does that tell us who's on the other side acting in a way that he finds disrespectful? It could have been a man. He could make the exact same comment. It could have been, but a reasonable jury could find. Why? Why is that anything but pure speculation? Because we have this overwhelming comparator evidence. Right, so that's the evidence. I agree with you. We have to dig into that and figure out if that's right or not. But this doesn't really advance to that point. The comparator evidence needs to be resolved. But I don't see how that comment, which is a centerpiece of your brief, has gender connotation on its own. You know, I talk to people about that comment, and they acknowledge that there is a gender component to it. Can I just turn you to a separate issue? I'd like to talk about, before we're done, the retaliation claim. I'd like to better understand your position on the adverse action, given the ongoing negotiations over what kind of the tail end of her transition period would look like and potentially her attorney cutting off the negotiations there. So what's the adverse action? The adverse action is, one, they contemplated her working through June 2019 and her continuing to work in a contractor status. But they contemplated that, right? They hadn't agreed to that. They contemplated that. And then they curtailed it after her lawyer said she's been discriminated against. But also after her lawyer rejected the offer, right? But they were contemplating continuing for June. I'm curious about the ramifications of the holding that you're asking us to reach there. Are you suggesting that once negotiations are underway, the employer's hands are tied and they have to agree to whatever they initially offered in order to avoid a retaliation claim? That seems to me to really create problems for these kind of negotiations that might occur. It's not just a negotiation. They didn't suggest this out of sympathy. They wanted someone to cover the next three months. They needed her. But she turned them down, right? No, she didn't turn them down. The demand letter contained an expectation that she would continue working there to the end. So under the Alvarez case, which I provided you, I think it's dispositive. They cannot curtail a transition period based on a protected conduct. And that's what happened. The day after the protected conduct, Talbot-Clement says, she's done. We have to get her out. She's making allegations we don't support, unless there's anything else. So she's on the retaliation point. They tell her, March whatever the meeting was, you are terminated. But there's no day after that that she doesn't work. I mean, it's understood right away with Talbot-Clement she will continue to come to work? Yes, she never says, I'm not going to go to work now. She goes on vacation April 19th to the 24th or something. But there's always an expectation from her point of view that she's going to continue working. And they never told her to stop until that day. Which is the day that the letter comes from the lawyer that says, you know, I want this large severance. There's gender discrimination. And I'm not happy with the independent contractor agreement that you provided. And then, I mean, I do think there's sufficient evidence of retaliation, which is why it comes down to, is it an adverse action? And so if you would describe the adverse action very precisely, you would say it is? Truncating the transition period so that she loses two months of salary and taking away the independent contractor position that she had been working in for years, by the way. Can you point me to the agreement that would support her expectation of another two months? Well, no one disputes that the idea that was propounded on March 26th was continue for the next three months. Everyone was on board with that. That was never taken away. That was pending an offer. I'm struggling with this because that was pending an offer from the employer that they deemed acceptable. And so they apparently tolerated her continuing to come back to work during that period of time. But then once that offer was rejected, I'm struggling to see how she could impose her expectation of continuing to work, having rejected the offer from the employer. Right. Well, I'm suggesting to you that it was not only a part of the negotiations. It was an aspect of their need to continue to have someone in that position for that period of time. They started recruiting the day after her termination. They needed her. They didn't say this is contingent on a successful resolution. I mean, how does this case come out if they say, well, it seems like we're not going to be able to find a way for you to continue working here because you're not accepting what we want, so we think it's best we separate today? That's a different case because we have direct evidence that it wasn't that. It was she's making these allegations. She's done. The next day. So the question is, with knowing that sort of our negotiations will stop over how long, I can say the question of this case is, would that reasonably dissuade a person from complaining about gender discrimination? Exactly. Thank you. Attorney Betancourt, please. May it please the Court, my name is David Betancourt and I represent Dr. Urion. The district court correctly found that Gina Russo had failed to establish the elements of a prima facie case of gender discrimination. Now, the only issue on appeal relating to Dr. Onn is his potential liability under the New Hampshire law against discrimination and sort of the Fred Fuller v. EOC case, which requires establishment of a district court. What aspect of the prima facie case do you think was not satisfied? So it depends on what elements the court decides to use to create a prima facie case. As the court's explained, when you're setting up the elements for a prima facie case for gender discrimination, it's somewhat fact specific. The district court used the Serrano-Colin framework. I think in their reply brief, Russo suggested using Ripley instead. Either way, under the Serrano-Colin, one of the issues is whether or not Gina Russo was performing her job adequately. Under the Ripley, one of the questions for analysis is whether the facts surrounding discrimination I mean, isn't that a minimum of a disputed fact in this case? Some people thought she was, Onn didn't. But, I mean, whether she was or wasn't, they have met, I would think, their minimal burden of showing some evidence on that point. I don't know if that's your strongest place to start. Sure. So the district court's holding is their burden under the McDonnell-Douglas framework to establish a prima facie case, they didn't. And the district court assumed they would be able to establish it and then analyzed the case to decide is there any evidence to rebut this nondiscriminatory motive for the discrimination. And the factual record does not support that discrimination was related in any way to gender. It relates to this deterioration of the working relationship between Gina Russo and Dr. Onn that occurred over a number of years. I'm most interested in the comparator evidence argument. What's your response to what you heard your opposing counsel state as far as treatment of other men and, you know, for instance, accepting them or not accepting them in the operating room? So I think it's an incorrect statement of the record. I think it's undisputed if you look at the interrogatory answers in the Neurospine where they state that review of their records indicates Dr. Onn recommended termination for both Russell Dennis and Michael Smith, who were male PAs. That corroborates the testimony that Dr. Onn offered at his deposition, that he didn't want to operate with those two male PAs, and that those were the only other two individuals besides Gina Russo that he wanted to advocate for termination for in the course of his, you know, 20 years at New Hampshire Neurospine, as he started in the year 2000. In addition, you also have deposition testimony from Ann Talbot-Clemen, who is the executive director of New Hampshire Neurospine, also corroborating that Dr. Onn had these issues with Michael Smith and Russell Dennis. So I think to the extent that the plaintiff is trying to use this omission in the interrogatory to create a genuine issue of material fact, that's really not supported by the evidentiary record, which was undisputed below that Dr. Onn had these issues with these male PAs, in addition to Gina Russo. The difference is with those male PAs is they resigned prior to proceeding to any type of termination, so there wasn't the same adverse action. But in terms of the comparator evidence, the plaintiff simply is incorrect that he treats male PAs differently from female PAs. Rather, the evidence shows Dr. Onn has certainly very high standards. I think as Investigator Bailey noted... What if it's not just, I mean, I understand the focus on termination, but there seems to be some evidence that when there was somebody who sort of acted up or out, he acted differently if they were male versus female, which is different than termination. Certainly. And we certainly disagree that the record actually supports that or creates any issue of material fact. What if you see in the... Well, they focus on Miller. I'm sorry? They focus on Mr. Miller saying, you know, when I did things, or that he acted as if it was a teaching moment and didn't blow up, and he doesn't blow up at men. Yeah, and I think it also ignores the fact that his testimony is that one of his favorite PAs to work with was Karen Berry, who he indicated described as one of the most highly skilled PAs that he worked with in his time at New Hampshire Neuroscience. Those aren't mutually inconsistent. You can be pleased with how a woman who you happen to like acts, but in general you blow up at women who don't do what you want, but men who don't do what you want, you're more forgiving. I don't see how that leads to some re-judgment, at least. Yeah, sure. Well, I don't think the record supports this finding that he actually blew up at women when they didn't do what he wanted. You know, there are certainly hearsay evidence in e-mails of different people complaining about him, other than Mr. Miller indicating that there was this teaching moment. The evidence of the record simply isn't there that he has this tendency to blow up every time someone takes a contrary tone with him. In fact, you know, when you even look at the initial March 2016 incident, when he had this pretty substantial disagreement with the plaintiff about whether she was going to go to the hospital to attend to his patient, there's no indication he blew up at her. He simply tells her, all right, get to St. Joseph's Hospital when you have the chance. At the end, even though he was feeling incredibly disrespected at that point in the conversation, even though his wife was listening to the conversation, she couldn't believe the tone and the attitude that Gina Russo was exhibiting in the context of that oral communication. So, you know, I don't see that there is actually sufficient evidence on the record to support this sort of speculation and character assassination by the plaintiff that he has this tendency to blow up at female PAs. So Miller said, did he not, that he did blow up on occasion, that Ann did blow up on occasion, but when it was male PAs he tended to later come and talk to them in a more calm fashion to smooth things over, I believe his words were. Is that not a distinction between his treatment of women PAs and male PAs? I disagree that sort of Mr. Miller's sort of anecdotal opinion evidence is empirical evidence of how he treats female PAs over the course of his tenure, sufficient to create an issue of material fact. Why? Why not? Simply because, you know, you have the opinion of one male PA doesn't establish that there is gender bias at root here in the issue as opposed to... So is it not evidence that when he blew up at male PAs he then tried to smooth things over with them? When the guy says that's exactly what he did? So I don't believe the evidence supports that when he was advocating for termination of male PAs such as Michael Smith and Russell Dennis who he didn't believe there was any opportunity to smooth things over. He would attempt to smooth things over if he believed there was a chance the issues could be fixed and resolved, which has to do with his assessment of how they worked with him in the operating room. There's no indication that has to do with gender as opposed to sort of gender neutral. Except that Miller said it was gender. Miller's opinion that this occurred... No, it's a statement of fact. When it was male PAs he would smooth things over later. That's not opinion. Well, I think I'm characterizing it as smoothing things over as opposed to having further conversations in terms of what are you doing wrong? How can your performance be improved? I think that is somewhat of a... How else is this ever proven? I mean, it has to be proven some way where we're showing disparate ways of treating people. Well, we don't keep records of that. Other people observe how someone acts and they say, I noticed that he treats the men this way and the women that way. And that's got to be evidence of how you treat people. I mean, there's no other way to do it. Well, I think you look at sort of the empirical evidence in terms of his relations over the totality. I think you can take individual statements relating to an opinion as to how an individual acted, but then you also have to look at what are the reasons for that specific interaction, like with this one male PA, what happened, which caused him to decide this is an issue that he could approach later. And I think that's part of the problem in this case for the plaintiff, is that they didn't establish enough factual evidence at the summary judgment stage to establish that the reason he's talking to these PAs have to do with gender-motivated animus, as opposed to other gender-neutral reasons. Is there no further questions? Thank you. Attorney Crenlan, please. Good morning, Your Honors, and may it please the Court. My name is Amanda Crenlan, and I am here on behalf of the Apelli New Hampshire Neuroscience Institute. This Court should affirm the lower court's judgment, granting summary judgment for two reasons. First, plaintiff's claim for retaliation fails for lack of causation and the fact that terminating voluntary negotiations is not an adverse employment action. Second, where the plaintiff's claim for retaliation fails for lack of causation and the practice's nondiscriminatory reason for terminating plaintiff never wavered and where there's no discriminatory animus by Dr. Ahn for Katz et al. liability to attach. Do you agree if Ahn, who was a partner in this place, was motivated by gender and came in and said, it's her or me, and he's motivated by gender, and then the company, the practice says, well, it's going to be you because you're the doctor, that that would be sufficient for liability? No, Your Honor, because under Katz et al. liability, and as Plaintiff's Counsel expressed, this isn't a rubber stamping of what Dr. Ahn wanted to happen. It's undisputed in the record that each of the surgical partners at that meeting had an opportunity to grapple with this issue, decide whether there were alternative solutions to the decision that they were faced with. But they would have been given an ultimatum based, I'm assuming, based on gender bias of their partner, and they're given this ultimatum. So how does that, what absolves the neurospine for acting on the ultimatum that's motivated by their partner's gender bias? Well, the evidence shows, Your Honor, that they really grappled with this issue of what to do, whether to part ways with the 20-year surgical partner at their practice or to say goodbye to Plaintiff. And it's undisputed that the reason given by Dr. Ahn here is that he felt so disrespected that he could not continue his employment at the Institute. He would either leave or Plaintiff would have to go. And what Plaintiff fails to do, as Your Honor pointed out, is tie that feeling of disrespect to anything related to gender. So we're merging. What if they did? What if they've done that? And so Ahn is there saying, based on gender animus, get rid of her, and if you don't, I'm leaving. So put aside the disrespect. I'm not saying that's wrong. I'm just saying put it aside. Assume he's motivated by gender animus. It's a tough choice for the rest of the partners. But ultimately, they decide we're going to get rid of her because we'd like to keep Ahn. It would be a closer call, Your Honor, but I think there's still a question here of whether it's a rubber-stamped issue, and I don't think it is, given that all of the partners at the practice went and had the opportunity to say their piece on the issue. It's not that the practice has to prove that Plaintiff did anything wrong. Instead, what the Plaintiff has to prove is that that feeling of disrespect, which is undisputed in the record, he reports it to the Executive Director, to his partners, to the investigator, and it's corroborated, in fact, by Plaintiff's own statements about Dr. Ahn, which don't take place after the shareholder meeting. They occurred beforehand, and we see that on pages 380 through 81 of the record. She says that she doesn't respect Ahn. She calls him names. That is corroboration for that feeling of disrespect that Dr. Ahn felt. And we know from the Santiago case that we can decide an issue of motive and intent on summary judgment where all that Plaintiff relies on, or the non-moving party relies on, is conclusory allegations, unsupported speculation, and improbable inferences. And that's all we have here with this statement about looking in the mirror as a father to small children. As far as the retaliation claim goes, the only adverse employment action that occurred here was on March 25, 2019, when the Plaintiff's employment was terminated. It was not until four days later. Was there some sort of implicit agreement that she could continue working at the Institute for a period of time, such that once they hear of the allegations, they say, well, these allegations are unacceptable, so she can't come anymore? Was there some sort of agreement between the parties that she could continue working during that period of time? The only agreement that was in place was an agreement to try to come to a resolution. But she is working. She was working. So she's fired, or she's not fired. The decision to terminate is made. Correct. She continues to work. Correct. No one tells her, don't work. That's correct, Your Honor, but it is incorrect. And then they're working out some kind of longer-term situation, and they come to some kind of disagreement about that in a letter that discusses her gender concerns, and the response is, we're done. We don't like the allegations you're making. So it seems to me that there was some kind of loose relationship continuing on that was somewhat undefined, but the letter ended it, and the evidence is, at least to me, enough for a jury to think the reason the letter ended it was the retaliatory response of Talbot Clements. A couple of corrections in that chronology, Your Honor. First of all, the first time the plaintiff raised gender discrimination allegations was March 29th. In that conversation with the executive director, she raised these allegations. Why is that operative? So, I mean, all right, so Clement just thinks, well, she's carrying on with it. This is really getting annoying. We're done. Well, that's well before the letter came, Your Honor. No, but so what? So she said it once, and they didn't do or they did do something, and then she says it again, and now Clement reacts, you know, getting a lawyer a letter that says it is, you know, more jarring, and she reacts that way. I mean, I just don't see why you're sort of insulated because she didn't do something on the March 29th statement about gender. Well, we know from the David case, Your Honor, that where an employee rejects an offer made by an employer, that's not adverse action against that employee. That's action taken by the employee herself, and that's exactly what happened here in that letter on April 29th. She rejected the independent contractor agreement that was part of the proposal that New Hampshire Neurospine had set forth. Didn't propose any alternative red lines to it. She rejected all of the terms up until that point had been negotiated, what the last day of work would be, how the PTO would play in, and the correction, it was not agreed to that she would stay until June. The last proposal that was on the table was that she would work until April, and they never heard back from Plaintiff's Counsel until that rejection occurred. So here's the problem that I have with your narrative. It's determined that she has been terminated or will be terminated with the date to be figured out later, hopefully through negotiation. Subsequent to that, she's an employee at Sufferance. As Judge Affran pointed out, she shows up for work. I'm going to assume she got paid, but whether she did or not, she's not told that she can't work. When she then is fired, there are two reasons that are given that I saw in the record. One is the demands that she makes. The other are the unacceptable allegations. So you've got sort of this mixed thing. One may be sufficient, but how do you deal with the fact that the statement is made that she's made unacceptable allegations? That is classic retaliation. And it has to be tied, though, to an adverse employment action. And the adverse employment action... Which I just stated was they terminated her employment at Sufferance. And you cannot terminate an employment at Sufferance on illegal grounds. You can't do that. May I answer, Your Honor? Of course. She was not entitled to that extended period. That was still under negotiation. What the last... But it was happening. She was showing up. They weren't telling her not to show up. She's showing up day after day and taking vacations, which is, you know, her earned time. She is showing up. And then they say, stop showing up because we don't like your allegations. But that's all because part of the offer that the practice had made was you can continue working until X date. You can have this PTO to extend that term of employment. You can have this severance pay. All of that went away when it was rejected by the offer. All those terms that had been negotiated up until that point were rejected. And if they had said, and so your employment at Sufferance ends now because you've rejected our reasonable attempts to settle this. But that's not all they said. They said because she made unacceptable allegations. That's the problem that I'm still waiting to hear an answer on. And she wasn't entitled to that extended employment. This isn't like the Alvarez case. No at-will employee is entitled to anything. They show up to work and then they can be fired at any moment, except if it's for an illegal reason. So she's still showing up to work as an at-will employee. And so would you be reasonably dissuaded from complaining if you thought that this at-will employment that I have right now will be terminated? I mean, that would be the question. But she wasn't dissuaded, Your Honor, because she rejected the agreement. She instead wanted that payment. She didn't want to continue working. That was part of the proposal that had been made. And for all these reasons, Your Honor, we respectfully ask that you affirm the lower court's decision granting summary judgment. Thank you. Thank you. You asked earlier about what connects this situation to gender discrimination. The Reeves case is very clear. A prima facie case plus pretext creates that link, and that's what we have here. Of course, we have prima facie case. She was replaced, but a part-time woman was replaced by a full-time male, Eric Velasquez, soon after her termination. Spend your time on the pretext, not the prima facie case. Right, right. Well, many examples of pretext in the brief. One, he says that she can't operate with me because her skills are inadequate. The evidence is overwhelming that she was very skilled. I mean, is it really unclear that when they go to the board, the partners, to get rid of her, it's because he finds her to be rude, disrespectful, and somebody he can't work with, and it's her or me? I mean, isn't that the reason? No. No, because in a stereotypical case, you look at... You look to the reasons for the ultimatum in a cat's paw case. You don't narrow the inquiry as to was there an ultimatum or not. It's what was the reasons for the ultimatum, and many of the reasons for the ultimatum are shown to be pretextual because that's the proximate cause, right? They did not... The board doesn't investigate. They don't bring her in. They're not trying to determine if she was insubordinate at all. They never made that finding. All they said was, we have an owner, we have a shareholder, we have a voting board member, we have a doctor. We have to stick with him. That's the only thing that they said. So then you have to look at the motives for the ultimatum, and those disappear under examination. Another example is he claims that she gave surgical advice to a patient. She never did, and he acknowledges, I don't know what he said to her. But then in this fit of anger, he says, you're only supposed to advise patients about bleeding and infection. And she says, what are you talking about? I have to do all risks. And later he says, she's right, but he was so angry that he told her the wrong thing. I mean, this is a man who's over the top. This is a Burns versus Johnson issue. So they talked about how he liked working with Barry. Well, Barry doesn't come forward and say he was respectful to her at all. This is a situation where all the doctors, all the 11 doctors over all this period and significant turnover were male. And also all the women leave the physician's assistant position. And, in fact, Jenkins, during the termination, says, hey, this looks like gender discrimination. I'm concerned about this. That's what he says. And a reasonable jury could say the same thing. Thank you. Thank you. Thank you. Thank you.  Our next case this morning is 25-1857, Elizabeth Putnam, et al. versus EPR Properties et al. Good morning, may it please the court. My name is Ben Zimmerman. We represent the estate of Anthony Putnam. With your permission, I'd like to reserve three minutes for rebuttal. You may. For over 30 years in this commonwealth and in this circuit, courts have found personal jurisdiction over foreign hotels for injuries to Massachusetts citizens that occur and deaths that occur at those hotels. The cases of Tatro, of Nanju, of Nowak are controlling in this case, and they've been followed for decades in the Sigros case, the Rooney case, the Kalkins case, and others, as they have to be in the district court. All of these cases use the same analysis. They all started with the uncontroversial premise that we're going to accept all the plaintiff's allegations if supported as true, that we're going to ignore contrary affidavits, and all of them allowed for jurisdictional discovery if personal jurisdiction was seriously challenged or facts were in question. All of them did. The district court decided to follow none of these cases in deciding this case at the motion to dismiss stage, instead citing, without analogizing or even really evaluating, the cases like Kwon, Chen, and Ward, which, if you look at the records and the opinions and the facts of those cases, have nothing to do with the circumstances here. We start with what I will call the hotel cases, the five key hotel cases which have been established law for 30 years, and what do they show? Well, we start with the facts, and the facts have to be construed in our favor, and we start with the complaint, as all of the district court opinions in NANJU, written by Judge Burroughs. Can I direct you to address the type of documents that we can look to? Obviously, there's an argument over authentication in this case. What can and can't we look at? Yeah, I think that's a fair question. I want to point out, though, that we're on an appellate record here where these documents that we're talking about were never objected to. They were never subject to a motion to strike. They are in the record, and so they are in for all purposes as a matter of appellate law. But a practical answer to your question, Your Honor, is we have to go with what's publicly available. The judge, at the hearing of this motion, said, well, you haven't authenticated any of these documents. And I said, well, respectfully, Your Honor, it's really hard to get documents authenticated if you're not going to give me any discovery or deponent to ask questions of. And she just flew right by that. So it's a fair question. I don't think it applies in this case because the records are in evidence without objection and without a motion to strike. Had they moved to strike them, we would have been able to have that discussion. How do we authenticate them? What discoveries do we need to put them properly in evidence? That never happened. They're just in evidence, or they're just on the record. So I don't want to go through the allegations of the complaint because I know you've read it, but I think it's important that every opinion of the district court started with the facts of the complaint. And we have alleged, more specifically than anyone usually does, five-year-old Anthony Putnam was killed at the Hotel Valcarce when a bed fell on him. Premier Parks LLC operates many locations, including this one, including the Hotel Valcarce. Premier Parks does so through a triple-net lease. This is in the complaint. Through a triple-net lease with the owner, EPR, also a defendant in this case, and Premier Parks had numerous contacts with the plaintiffs before and after the incident in this case related to their marketing in Massachusetts, which I'll get to in a minute. And they induced them to buy more rooms, buy services, the kind of contacts that they routinely found to be sufficient to confer personal jurisdiction. So I see two different issues going on here. You've got one, who owns it, two, who operates it. I think it would be interesting to hear on both of those. Sure. But on ownership, it seems like you might have more on management. On ownership, what do you have to truly create a dispute over whether or not EPR owns that as opposed to, I think, his Valcarce property LP? I agree with your Honor. I think the case for management and operation is stronger than against Premier Parks LLC versus EPR. However, we do have the June 22nd company statement. It's been variously referred to as a press release, but it's a company statement on their website. It's never been denied that it was their statement, saying that they bought these properties and that they were leasing them to Premier Parks on the triple-net lease. So that's in evidence, or that's on the record. We have Premier Parks' statement that says that this group is going to become part of the Premier Parks family, and we have in that statement that they referring to EPR properties, which is the name defendant in this case, as the new owner, and themselves as new management of the hotel. What I'm struggling with a little bit on that is I have a hard time reading those as inconsistent with the statement that EPR provided, which was, no, this separate entity, subsidiary to us, is the one that actually owns it. So the broad statement, I get what you're saying, but is that really inconsistent with their more precise information in the affidavit? I do think it is for the purposes of a motion to dismiss. I take your point, as is the point, obviously, we've talked about. I think you have to take the documents at face value. They say EPR properties. If it turns out that we're wrong and the affidavit is right, maybe that changes down the road. And that was even referenced by my brother as the argument on the motion to dismiss. We think we're saying the right thing, but if we don't, we can always add us back in kind of thing. And I think with respect to EPR, that's a fair criticism. With respect to Premier Parks LLC, though, there is no doubt that on this record, we have a plethora of evidence supporting, directly supporting and corroborating the allegations of the complainant, that they operate and manage these hotels closely. They do it with 5,000 to 10,000 employees. They buy them. They manage them. I mean, this is all on the record, and the district court just completely ignored it. And that is extreme error not to follow the precedence of this court. And I would remind you that Premier Parks LLC, this can get lost in the fray a little bit, they never even claimed not to operate the hotel until their reply brief when they submitted Ciaran Burke, who owns all of these companies, Ciaran Burke's affidavit. So it wasn't until they saw our evidence, our documentation of their direct management and operations of the hotel, that they decided they were going to submit an affidavit, giving us essentially no chance to respond to. But the truth of the matter is, we shouldn't even be talking about their affidavits. And if you read the NAMJU case closely, and go to the documents in that case, and the NOAC case and the TATRO case, by the way, in which this was after discovery, but there are affidavits exactly like these in the record on those cases, and they aren't even mentioned in the district court's opinions, and they're not even mentioned in this court's opinions because they're not to be considered when they controvert our evidence. And if you read the district court's analysis, it's very interesting. So when is, if I take everything you just said, and then there's a conflict. So I understand on the prime official case we can't just accept what they say, but they may be right. So at the end of the day, does that mean we should be leaning towards giving you jurisdictional discovery, or you just went out right on this jurisdiction? I think I went out right because the allegations and the corroboration is such that what should have happened here is that jurisdiction should have been found, and we should have reserved on that for summary judgment. That's what should have happened here. But if we have a bunch of non-authenticated, I'm talking about Premier Park, a bunch of non-authenticated documents, and I see the VVV logo is on their website, they have a glass door thing, they have a domain name out there, so it looks like there's stuff in your unauthenticated documents, but maybe it's not as it seems by those documents, and they do have an affidavit that I understand the point, we just can't accept that affidavit. What is the right thing to do there? Yeah, well, the right thing to do, well, the right thing for the district court to have done was to follow the case law and allow the jurisdictional discovery in the first place so we wouldn't be here. And skipping to that point, which is an abusive discretion standard, which I happily accept, but she blew by a whole range of cases, the Swiss American Bank case, the Adelson case, the Gartec case, the Serpitsky case, the Blair case. They all say, in form and substance, look, if the plaintiff makes a reasonable argument for their allegations and has a reasonable documentation of it, then the bar for jurisdictional discovery is low, and it's supposed to be, because there is no way for the Putnams, who lost their child, to know what the corporate structure of Premier Park, L.O.C. Even if the affidavit's true, you know, there are cases like Sigros and others that talk about confused intermingling, so even if, as a formal matter, it's one way, these things I pointed out might suggest some integration that might also be favorable to you. Is that right? Yeah, Sigros is clear on this issue. It's impossible to know all the Disney entities, right? But the other interesting thing is, if you read Nandu carefully, Nandu has a Canadian company who owns a hotel in Canada who says, submits an affidavit that says, we don't have anything to do with Massachusetts, we don't know what you're talking about, we don't do it. The district court and this court found an agency relationship, a reverse agency relationship, between the franchisee in Canada and the franchisor in the U.S. to find jurisdiction over the Canadian company. We're not even asking for an agency relationship here. So, to your point, if this alphabet soup of companies is subject to some discovery and we determine there may be an agency relationship, we couldn't allege that because we didn't have that. But do I expect that that's going to occur? One hundred percent. There's no doubt from these documents and from what we know that Premier Parks LLC is running this hotel and in form and substance. So, back to my sort of point, which is that we shouldn't be here, right? Jurisdictional discovery should have been allowed, a full summary judgment record should have been created, and why that wasn't done, I have no idea, but I would implore you to correct the error both in the jurisdictional discovery, but I do think the proper order would be to plan to make a decision showing personal jurisdiction, at least as to Premier Parks. Thank you.  Attorney Brennan, please. Good morning, Your Honors. William Brennan for Premier Parks. Mr. Zimmerman just made a strong statement about why there should be jurisdiction over a hotel. They didn't sue a hotel. Where's the hotel? The hotel, the accident happened at the hotel at Valcartier, but they weren't sued. I don't understand why, and that was the major focus of the district courts. But they say you run it. There's no evidence on that point. Well, your website depicts their logo. You offer jobs for them. You have their domain name on your website. You've announced that their group has joined you. You say that you provide hands-on operating philosophy and a relentless focus on the same website that has their logo. That's stuff. None of that goes to the actual jurisdictionally relevant questions. Jurisdictionally relevant questions. So there is a chain of hotel cases. Massachusetts asserts very broad jurisdiction over foreign hotels that solicit and book rooms for Massachusetts residents. But in all of those cases, there was no dispute as to who the hotel was. There's no case that's really on point on these issues. The two jurisdictionally relevant questions that I see are who operated the hotel in January 2024 when the accident happened, and who booked rooms for Ms. Putnam in 2023 when she booked those rooms. There is evidence on those points. There is admissible evidence on those points. The admissible evidence is Ms. Putnam's affidavit in which she describes nothing to do with Premier Props. Premier Props does not appear in her properly submitted affidavit. Because those all refer to Valcartier. Village. Valcartier. I'm just calling it VVV. Right. So she's referring to VVV. Yes. I follow that. And Premier Parks is referring to VVV. So then the question is, what is the relationship of Premier Parks to VVV, which is on their website? And there's no evidence on that other than the evidence that says VVV operates it and Premier Parks does not. So the only admissible evidence... Didn't Judge Aframe walk us through the contrary evidence? How can you just ignore that? I'm not sure how much more the plaintiff can give, given publicly available information prior to discovery. What more could they provide? So they have... So to go through the unauthenticated evidence, Your Honor? Right. So there is a logo. Premier Parks runs and advises on water parks and various resorts. It doesn't say they operate everything. Sometimes they acquire things, sometimes they sell things, sometimes they advise. It doesn't say... That logo doesn't specifically identify any specific corporate relationship of operation, much less... And Premier Parks buys and sells things, much less at the relevant times. They have to say not just that at some point unknown in time there was an unknown relationship between VVV and Premier Parks. They have to say that it's jurisdictionally relevant, and that's what has to be drilled down on. What is jurisdictionally relevant? There is a map on EPR's website. My client can't control what's on EPR's website. There is a glass door job posting. I believe that one was from October 2024. So that's ten months after the accident. But all of this feels like sort of summary judgment kind of material, like okay, if this all ends up being nothing. But their point, which I guess I want you to address, is we are so early to shut this down without allowing them to explore what these things mean. And you're offering various responses, but you really don't have a... They point to these things and we sort of say, well, we don't know. So why isn't the right thing to do limited jurisdictional discovery to figure out whether these things mean something or they don't? The court, the district court got it right because the district court was entitled to take undisputed facts and consider them. The undisputed facts, the only evidence on who was running the hotel in January 2024 and during the time that the reservation was made, the only evidence is Ms. Servo's declaration that Premier Parks did not do any booking. So you brought up the logo and you said, well, the logo, you know, we do a lot of different things. But then the same website says one of the things we, Premier Parks, does is to provide a relentless focus on guest service and safety. And so how do we know that your use of VVV logo isn't related to that same we are a guest service company? This is putting the plaintiff has the burden to come up with evidence. Even at this stage, they have to go beyond their complaint. They're not trying to go beyond their complaint. They're just saying, look, here's a logo. What if we speculate about that? But this court's precedents make it clear that speculation is insufficient. There is evidence on who ran the hotel. It's all admissible. The evidence that the speculation is based on, one, it's speculation, and two, it's unauthenticated evidence. That's improper. It's setting the bar too low. If a plaintiff can come in – What's your case law that we can't take a look at an unauthenticated document that hasn't been objected to? Do you deny the accuracy or authenticity of those documents? I do not. I think that the court should require an authentication requirement because I think that its precedents require that. But what I say is when you look at any of those, they don't say anything. What would they do to do that where they've been given absolutely nothing? They write a complaint like I guess everyone does. They gather up what they can. They write it out in narrative declarative sentences. They come to court, and the judge says, go away. And what they ask for is to, judge, let us ask some questions. That is how you, I think, authenticate the document. Well, how do you authenticate the document? They could have said, some of these documents are undated. They could have had a marshaling affidavit where somebody said, here's where I looked and where I found it and the date I found it on. But there's no mystery as to who the hotel is. If you go to the, and this is in the record. Again, if you go to page 201 of the record. But there's a connection between the hotel and Premier Parks. There's some connection there. But what the connection is is pure speculation. And the court should not, but there's pure speculation except as to the admissible evidence. The admissible evidence is. Why do we have a concept called jurisdictional discovery if they have to prove it without anything? You know, they've done something, I think. So, why do we have that? If you're right, then you wouldn't need it. If no, if my client had not put in those affidavits, then they would have. Why would we need jurisdictional discovery? We'd have an undisputed complaint that would establish jurisdiction. I mean, you call it into question. Right. And then I see things on their side that suggest who knows. And so it seems to me that the beginning interim step before discovery about the accident and all the things is to figure out who's right about this. Respectfully, Your Honor, the district court is not required to just indulge speculation. When there are facts on the disputed issues, there are facts. The facts as to who was running the hotel at the relevant times are undisputed. Does Court's precedent say we have a- Do you agree that sometimes there can be intermingling of entities that creates, you know, even though you say one is running it, there could be enough cross-pollination that the issue becomes blurred? In the Sigros case, that was the fact pattern, yes, Your Honor. And so why aren't they allowed to explore, given that I see some connection being established between the entities, whether that's the kind that meets the Sigros kind of idea? Because in this case, there is undisputed facts as to the jurisdictionally relevant questions. There is no dispute. And this court requires- The precedents of this court require genuinely contested facts. Genuinely is very clearly said it's more than speculation. Mr. Zimmerman has come up here and said maybe there's something. What Your Honor is suggesting is maybe there's a connection. That is per se not enough under this court's precedents. When we put in affidavits- But doesn't your own affidavit suggest some degree of intermingling? Because you have the premier CEO saying that VVVSRI handled all the marketing. Presumably his affidavit was based on personal knowledge. Well, then we have a question of how does he know what VVVSRI is doing? Unless there's some- What's the relationship if he, as the premier park CEO, knows exactly what VVVSRI is doing? It seems to me that there might be some intermingling. Can I answer that? Mr. Burke is absolutely a controlling shareholder of both VVV and of premier parks. Doesn't that cut against you? No, because this is the situation in the Sigros case where even though there was- Disney, the public company, owned multiple entities that were doing business in Florida as well as Disney World. The entity that was not involved in the marketing and the solicitation, there was found to be no jurisdiction over that entity. I guess what I don't follow in all this is you're speaking in the language of summary judgment and you submitted affidavits and you say, Take those affidavits. We do that in summary judgment because the idea is that everyone- We've explored the thing and everyone puts it in. Then we see is there a disputed issue of fact worthy of further discussion. But here you say, well, they have what they have at the motion to dismiss stage. We gave the summary judgment quality affidavit because we know all the facts because we are the company. And then that's it. We're done. Go away because we gave you the affidavit. And so it's kind of like a trust me situation. I just don't understand why at 12B6 that should be the way it works. I believe that's based on your court's precedence. And we're not leaving them with nothing. It's not like we're telling them, go guess who the defendant should be. Everybody has told them it's VVV. They were running the hotel. It's their name on the bill. It's their name in the copyright notice of the advertising. You should be suing VVV. That's why there's no prejudice to them. There's no mystery left anymore as to who they should be suing. Do you at least agree that dismissing the prejudice was a step too far? Yes. That's in our papers that we concede that. Yes. And with that, Your Honor, if there are any further questions, thank you very much. Thank you. Mr. Boston, please. Good morning, Your Honor. My name is Peter Boston. I represent EPR. Briefly, because I only have about five minutes, I do think EPR is different in this situation, as the court has pointed out. What there isn't really a dispute on in this case, EPR doesn't even own the hotel. And what these other cases that have been brought up by Plaintiff's Counsel in this case, is that these other entities actually own the hotels in question. EPR doesn't. That's really not controverted, by the way. We have supplied that affidavit. And I understand what the court is saying with respect to, you know, affidavits generally with respect to summary judgment. But in this case, it's really not disputed. And I think my brother has almost conceded that in some respects. Because there's no dispute whatsoever. EPR doesn't own it, doesn't control it, doesn't mark it, doesn't do anything having to do with this hotel. The actual hotel is owned by another one of its subsidiaries. So we are even a step past or a step beyond in this particular case. We have no contacts whatsoever with Massachusetts. We don't market in Massachusetts. We don't do anything with respect to Massachusetts. We are simply a real estate holding company. That's what we are. And that's where we're in under Maryland law. And we are our principal place of business in Kansas City, Missouri. And that's kind of where we sit on this case. I mean, there is absolutely no evidence, even when you talk about premier parks and things like that, or you talk about who's directing and controlling, who the plaintiff dealt with, anything like that, there's absolutely no evidence whatsoever in the record that we did any of that stuff. None whatsoever that we marketed, directed, and controlled had anything to do with that. There's some evidence that there's a triple net lease, but the triple net lease isn't even with us. It's not even with EPR. Why wasn't that in the record? I mean, there's discussion of how the lease didn't make it into the record. Why is that? Well, Your Honor, to be quite frank, I guess the affidavit we put in, in hindsight, maybe we should have put in the triple net lease. Okay. There was some discussion. I know there was, in this case, there was some, they indicated there was a triple net lease. We kind of thought it was a legal issue, because when you use the phrase triple net lease, it really does have legal ramifications. I understand what plaintiff counsel knows about that, so that's kind of where it was, but that's where we sit. Okay. I don't know if anybody has any specific questions for me, but I do think we are far removed, and I don't think it's really disputed by plaintiff's counsel. Thank you, Mr. Fossett. Mr. Zimmerman. Your Honor, I'm not going to take the three minutes. I have just a couple of brief points. On page 277 of the record appendix, there's something from the EPR website that lists Village of Concert as an owned property as part of its portfolio, and it lists Premier Park as the operator of that property. So I think one of the issues we have here is we have to take these documents at face value on the record and say that's the evidence that EPR owns it and Premier Park operates it. Now, with respect to the affidavits, I want to just point out that the district court referred to the affidavits as their alibi. She actually referred to them as that. But when we see Village of Concert on Cartier in the communications with Ms. Putnam, there's no corporation associated with that. That's like getting an e-mail that says Disney on it. You don't know what Disney. Village of Concert by Cartier has existed as that entity well before EPR and Premier Park ever bought it. So the fact that it says VVV on it and not Premier Park, which the district court actually latched onto, is... In other words, it's a brand name. Yeah, it's totally divorced from reality and the record. So this was a case where, again, personal jurisdiction should have been found on the privacy issue standard, reserve the rest for summary judgment, allow discovery to go forward, and we'd ask you to reach that result. Thank you, Mr. Jimenez. Thank you. All rise, please. The court is in recess until April next.